IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Wiley Y. Daniel**

Civil Action No.  05-cv-01766-WYD-PAC

SHELLEY BURKE,

      Plaintiff(s),

v.

BRENT NITTMAN, in his individual capacity,

      Defendant(s).

---

**ORDER**

---

I.    <u>INTRODUCTION AND BACKGROUND</u>

THIS MATTER is before the Court on Defendant's Motion for Summary

Judgment, filed July 25, 2006 (docket #23).

Plaintiff Shelley Burke initiated this action seeking damages and equitable relief

for alleged violation of her rights under the First Amendment of the United States

Constitution.  Burke was employed as a safety and security officer at the Platte Valley

Youth Services Center ("Platte Valley"), a juvenile correctional facility located in

Greeley, Colorado.  According to the Complaint, Burke worked in a girl's unit known as

"Acadia" where her responsibilities included security for the girls as well as providing

supervision and discipline within the unit.  At all times relevant, Defendant Brent

Nittman ("Nittman") was the Director of the Platte Valley facility and Burke's supervisor.

Burke alleges that Nittman unlawfully terminated her after she expressed criticism of his

management of the Platte Valley facility.  Burke asserts a single claim against Nittman

in his individual capacity for retaliation in violation of her rights under the First
Amendment.

Several facts are not in dispute.  The Platte Valley facility is operated by the
Department of Youth Corrections, a division of the State of Colorado, Department of
Human Services.  Burke began working for the Platte Valley facility as a security officer
in April 2001.  Burke's 2002 and 2003 performance reviews rated her at "average" and
noted that she had problems completing timely incident reports, as well as poor
attendance habits and frequent violations of a rule requiring employees to call in more
than three hours before their shift begins if they are going to be late or absent for any
reason.  In early February 2003, Burke received a "performance notation" and a
Confirming Memorandum for violation the three hour rule.  The Confirming
Memorandum noted the Burke had called in sick eleven times in the previous three and
one-half months and noted three violations of the three hour rule.  On February 25,
2003, Burke received a Corrective Action after she again violated the three hour rule.
Burke received two additional performance notations for failing to come to work or
explain her absence in March and May of 2003.[1]

On July 7, 2003, Burke met with her immediate supervisor to discuss concerns
she had about the way juvenile females were interacting with one another in the Acadia
Pod at Platte Valley.  Burke advised that she believed a co-worker at the facility was
erasing or overturning disciplinary actions she had previously taken against certain

---

[1]The disciplinary process at Platte Valley begins with a performance notation as
a low level of discipline.  If the problem persists, a Confirming Memorandum is issued,
followed by a Corrective Action placed in the employee's file.

juveniles, and that this co-worker might be having a relationship with one of the juveniles.  Burke agreed these issues required an immediate response and impacted the safety of the juveniles and staff at the facility.  At the conclusion of the meeting, Burke was directed to write an incident report.  Burke turned in an incident report on July 8, which had to be done over.  The incident report was ultimately submitted on July 9, 2003.

On July 16, 2003, Burke sent an e-mail to Donald Smith, the Assistant Director at Platte Valley, which was a draft e-mail Burke intended to send to Nittman's superior, Mr. Maurice Williams.  Burke testified that she sent the draft e-mail to Mr. Smith to solicit his input prior to sending it to Mr. Williams.  The July 16, 2003 draft e-mail states as follows:

> Mr. Williams,
> I am deeply apologetic to have to bother you with Platte
> Valley issues, but I have no supervisor, and Brent has put a
> no contact with Don Smith.  I do not want to talk to you
> specifically about the investigation on Acadia, but what goes
> on in this building and Brents [sic] tolerance of it.  I have
> wanted to talk with you for some time, but have heard that
> you will not stand forsomeone [sic] not going through the
> chain of command.  I have no one else to talk to.  I will come
> to your office if you will allow me a few minutes to speak with
> you.  I am sure you have heard plent [sic] about Brent and
> management, but this my [sic] fourth facility and I have been
> in the system for 12 years.  We have lost incredible staff,
> and the tolerance for incompantant [sic] staff is now affecting
> me.

In July and August, 2003, Nittman sent Burke various letters advising her of problems with her performance and attempting to set up a meeting regarding potential discipline.  A meeting, referred to as a "R-6-10 hearing" with Burke took place on

August 27, 2003.  On September 11, 2003, Nittman sent an e-mail to two individuals above him in the chain of command, providing them with a history of the investigation in the Acadia Pod and advising them that it was his intent to terminate Burke and that he was finalizing the termination letter.  Burke e-mailed a draft of the termination letter to Mr. Williams and another employee on September 17, 2003.  Sometime after September 18, 2003, Nittman saw the July 16, 2003 draft e-mail composed by Burke. Burke was terminated on September 19, 2003.

In addition to the July 16, 2003 draft e-mail Burke sent to Mr. Smith, Burke contends that she sent several other e-mails to an employee above Nittman in the chain of command concerning mismanagement at the Platte Valley facility.  Burke is not in possession of these e-mails and cannot identify the dates of the e-mails.

In his motion for summary judgment, Nittman argues that (1) the "communications identified by Burke cannot constitute speech for purposes of the First Amendment," (2) that "any and all such communications were made pursuant to her official duties and thus cannot form the basis of a First Amendment claim under the Supreme Court's recent decision in *Garcetti v. Ceballos*, 126 S.Ct. 1951 (2006)," and (3) that Nittman has demonstrated as a matter of law "that he reached his decision to terminate Burke's employment without any knowledge of the communications to which she claims First Amendment protection."  *See* Def's. Mtn. at 1.  I address each argument in turn.

II.    ANALYSIS

    A.    Summary Judgment Standard

Summary judgment may be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the ... moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).  The burden of showing that no genuine issue of material fact exists is borne by the moving party.  *E.E.O.C. v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1190 (10th Cir. 2000).  In reviewing a summary judgment motion, the court must view the evidence in the light most favorable to the nonmoving party.  *Anaya v. Crossroads Managed Care Systems, Inc.*, 195 F.3d 584 (10th Cir. 1999).  All doubts must be resolved in favor of the existence of triable issues of fact.  *Boren v. Southwestern Bell Tel. Co.*, 933 F.2d 891, 892 (10th Cir. 1991).

"[The plain language of Rule 56(c) mandates the entry of summary judgment , after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. at 322.  "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322-23.  The moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Id.* at 323.

B.      Whether Summary Judgment is Appropriate In This Case

1.      First Amendment Freedom of Expression

In *Pickering v. Bd. of Education of Township High School District 205*, 391 U.S.

563, 574 (1968), the United States Supreme Court held that an employee who speaks

on issues of public importance may not be dismissed from public employment.  The

analysis is a First Amendment issue -- "[t]he threshold question in assessing the free

speech claim of a discharged ... government employee is whether the employee has

spoken 'as a citizen upon matters of public interest' or merely 'as an employee upon

matters only of personal interest.'"  *Gardetto v. Mason*, 100 F.3d 803, 812 (10th Cir.

1996) (quoting *Connick v. Myers*, 461 U.S. 138, 147 (1983)).  The United States

Supreme Court recently reiterated that "when public employees make statements

pursuant to their official duties, the employees are not speaking as citizens for First

Amendment purposes."  *Garcetti v. Ceballos*, 126 S.Ct. 1951, 1960 (2006).

In addition, the First Amendment protects only speech that is of a matter of

public concern, and where the speech does not qualify as this, the First Amendment

claim fails.  *Gardetto*, 100 F.3d at 812.  "Matters of public concern are those which can

'be fairly considered as relating to any matter of political, social, or other concern about

the community.'"  *Id.* (quoting *Connick*, 461 U.S. at 146).  "While speech pertaining to

internal personnel disputes and working conditions ordinarily will not involve public

concern... '[s]peech that seeks to expose improper operations of the government or

questions the integrity of governmental officials clearly concerns vital interests.'"  *Id.*

(quotation omitted).

-6-

"Once a court determines that the plaintiff's speech involves a matter of public concern, the Pickering balancing test requires a court to weigh 'the interest of a public employee in commenting on such matters [against] the interest of the employer in promoting the efficiency of its services.'" *Gardetto*, 100 F.3d at 815 (quotation omitted). "In performing this balancing, the court should not consider the statement in a vacuum; the manner, time, and place of the employee's expression are relevant, as well as the context in which the statement arose." *Id.* "[T]he employee's First Amendment free speech rights are protected 'unless the employer shows that some restriction is necessary to prevent the disruption of official functions or to insure effective performance by the employee.'" *Id.* (quotation omitted).

If the court determines that the Pickering balancing test tips in favor of the employee and that the expression at issue was therefore constitutionally protected free speech, "the plaintiff must then prove that the protected speech was a 'substantial' or 'motivating' factor in the challenged employment decision." *Curtis v. Oklahoma City Public Schools Bd. of Education*, 147 F.3d 1200, 1211 n. 13 (10th Cir. 1998). "'[I]f the employee makes this showing, the burden then shifts to the employer to show 'by a preponderance of evidence that it would have reached the same decision ... even in the absence of the protected conduct.'" *Id.* (quotation omitted).

      2.    <u>Whether Burke's Complaints Constitute Speech For First Amendment Purposes.</u>

As an initial matter, I address Nittman's contention that the draft e-mail Burke sent to Mr. Smith on July 16, 2003, as well as the other e-mails Burke contends she

sent to an individual above Nittman the chain of command, cannot be considered "speech" for First Amendment purposes because they were "unspoken," and because Burke never actually sent the draft e-mail to Maurice Williams.

It is black letter law that writing constitutes pure speech for First Amendment purposes. *See Texas v. Johnson*, 491 U.S. 397 (1989); *United States v. Grace*, 461 U.S. 171 (1983); *Martin v. City of Struthers*, 319 U.S. 141 (1943). I am not persuaded by Nittman's assertion that the draft e-mail intended for Mr. Williams is not "speech" because it was never sent to Mr. Williams. While this fact may be relevant to whether Nittman was aware of the existence of the draft e-mail and whether the draft e-mail was a "substantial or motivating factor" in his decision to terminate Burke, it is not relevant to whether the draft e-mail constitutes "speech." I find that Burke's e-mail correspondence constitutes "speech" within the meaning of the First Amendment.

3.     Whether Burke's Complaints Constitute Constitutionally Protected Speech For First Amendment Purposes

Defendant next asserts that Burke's complaints are not constitutionally protected under the holding in *Garcetti v. Ceballos*, *supra*, because she raised these complaints not as a private citizen, but pursuant to her official duties as a Platte Valley employee. As discussed above, the United States Supreme Court in *Garcetti* held that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and their statements do not receive Constitutional protection. *Garcetti*, 126 S.Ct. at 1960. When determining whether a particular statement was made pursuant to an employee's official job duties, the "proper inquiry is a practical one." *Id.* at 1962. The fact that the speech at issue

-8-

took place at work or is related to the employee's job is not dispositive, and in some

circumstances such speech is still considered public speech and may receive

protection.  *Id.* at 1959.  In addition, while the listing of a particular task within an

employee's formal job description might be relevant to this determination, it is not

necessary to demonstrate that a task was conducted within the scope of the

employee's official job duties.  *Id.* at 1962.

According to Nittman, Burke had an official "duty" to report corrupt, unethical, or

other misbehavior by a coworker that could ultimately adversely affect the well-being of

the juveniles in the Platte Valley facility.  Nittman contends that Burke agreed in her

deposition testimony that all of her e-mails were prepared in accordance with her

official duties.  Burke disputes this assertion and notes that Nittman testified in his

deposition that her duties were to "supervise, observe, document, record, report, those

kinds of things that assist in our supervision of kids in [Platte Valley's] custody to

maintain a safe and secure environment."  Burke insists that her official duties did not

involve making reports about mismanagement or investigating or reporting on

misconduct.

Based on the record before me, and viewing the evidence in the light most

favorable to Burke, I cannot conclude, as a matter of law, that Burke's July 16, 2003

draft e-mail was made pursuant to her official duties.  During her deposition, Burke was

asked in reference to draft e-mail "[w]ould you agree that, really, it was essentially an

official duty that you had to try and bring those concerns, if you had them, to

somebody's attention, either at Brent's level or beyond."  Burke responded "I reported

things to my supervisors, Allisyn and Curtis, and what I suspected was going on.  It was nothing that was concrete."  Contrary to Nittman's assertion, this colloquy does not definitively establish that Burke's official duties included investigating or reporting on mismanagement by her supervisor within the facility.  Various statements in the draft e-mail indicate that Burke wrote the draft e-mail in order to raise concerns she had about Nittman's management of the Platte Valley facility generally.  In the draft e-mail Burke states that she did not want to discuss the ongoing investigation concerning Acadia Pod, but instead wished to discuss ongoing concerns related to Nittman's management of the Platte Valley facility as a whole.  In the e-mail, Burke states "I have no one else to talk to," and requests a meeting to discuss Nittman and his management.  While Nittman's description of Burke's job duties indicates that she may have had a general duty to make reports about unethical behavior by coworkers that might adversely affect the well-being of juveniles, there is nothing "official" about the draft e-mail at issue. The draft e-mail was not in the form of an official report, and there is no evidence that it was written pursuant to any particular policy or directive.  In short, there is no evidence that Burke was compelled to create the draft e-mail at issue based on her "official" job duties.  *See Kodrea v. City of Kokomo*, 2006 U.S. Dist. LEXIS 42327 (S.D. Ind., June 22, 2006); *Gray v. City of Cincinnati*, 2006 U.S. Dist. LEXIS 52865 (S.D. Ohio, Aug. 1, 2006).  For these reasons, I find that Nittman is not entitled to summary judgment on the issue of whether Burke acted as a private citizen when she wrote the e-mail at issue pursuant to the holding in *Garcetti v. Ceballos*, *supra*.

    4.    <u>Whether Burke's E-mails Were a Substantial or Motivating Factor in Burke's Termination</u>

Finally, I address Nittman's contention that even if Burke could establish that she spoke as a private citizen, she cannot show that such speech was a substantial or motivating factor in any adverse employment action taken against her.  Nittman asserts he decided to terminate Burke well before he became aware of the July 16, 2003, draft e-mail.  According to Nittman, he began drafting a termination letter on September 4, 2003, and advised two of his supervisors on September 11, 2003, that he was going to terminate Burke and circulated the termination letter to someone in personnel on September 17, 2003.

It is Burke's burden to show that her speech was a substantial or motivating factor in Nittman's decision to terminate her.  *Schrier v. Univ. fo Colo.*, 427 F.3d 1253, 1262 (10th Cir. 2005).  Because this issue involves causation, it is generally a question of fact to be resolved by the jury.  *Gardetto*, 100 F.3d at 811.  Here, it is undisputed that the first time Nittman had access to Burke's July 16, 2003, was on September 18, 2003, and that Nittman terminated Burke the next day.  Although Nittman has come forward with evidence that he would have terminated Burke even had he not seen the draft e-mail, Burke has come forward with evidence that the proffered reasons for her termination are pretext.  Viewing the evidence in the light most favorable to Burke, I find that she has demonstrated that material issues of fact exist that preclude the entry of summary judgment in Nittman's favor.

III.     CONCLUSION

In conclusion, for the reasons set forth herein, it is hereby

ORDERED that Defendant's Motion for Summary Judgment, filed July 25, 2006

(docket #23) is **DENIED**.

Dated:  March 2, 2007

BY THE COURT:


s/ Wiley Y. Daniel
Wiley Y. Daniel
U. S. District Judge